UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| KEITH PAUL BIRD, | Case No. 2:20-cv-02093-ART-NJK |
| Plaintiff, | ORDER |
| v. | |
| JAMES DZURENDA, *et al.*, | |
| Defendants. | |

Plaintiff Keith Paul Bird ("Bird"), who is incarcerated in the custody of the Nevada Department of Corrections ("NDOC"), brings this action pursuant to 42 U.S.C. § 1983 against Defendants James Dzurenda, Taylor Paryga, Harold Wickham, Brian E. Williams, Sr., Monique Hubbard-Pickett, Jonathan Binder, Mark Atherton, Willie Clayton, and Julie Williams (Matousek) (collectively, "Defendants"). (ECF No. 13 (Second Amended Complaint ("SAC").) Before the Court is Defendants' Motion for Summary Judgment (ECF No. 49).

**I.    BACKGROUND**

Plaintiff alleges the following. On November 11, 2018, at High Desert State Prison ("HDSP"), Bird approached Officer Bruce Huinker and requested a cell change because Bird believed he had "issues with his current cellmate that if left unaddressed would lead to a fight." (ECF No. 13 at 9.) Officer Huinker called Defendants Officers Taylor Paryga and Mark Atherton to speak with Bird. (*Id.*) Officer Paryga told Bird "[f]ight him or fight me," and then the officers "attempted to harass Plaintiff/shame Plaintiff into abandoning his [report]." (*Id.*) One of the officers then told Bird to "go roll up" his belongings. (*Id.*) When Plaintiff tried to comply, Officer Huinker attempted to lock Plaintiff in his cell and said over the speaker, "[Y]our [sic] staying in that cell." (*Id.*) Plaintiff prevented the door from closing and responded, "[N]o sir I am not." (*Id.* at 9, 11.) Officers Paryga and

1

Atherton ordered Plaintiff to put his property back in his cell and to then go to Classroom A. (*Id.* at 11.)

Afterwards, Officers Paryga and Atherton entered the cell with trash bags and "proceded [sic] to thrash the cell in retaliation for Plaintiff 'making them do their jobs.'" (*Id.*) The officers took "the Plaintiff's personal property such as religious books, legal papers, personal mail, food, etc." (*Id.*) The officers "failed to issue any unauthorized property forms to Plaintiff so that he could appeal their action/misconduct." (*Id.*) Officers Paryga and Atherton deny confiscating any items. (ECF Nos. 49-3 at 2; 49-4 at 2.) Officer Huinker issued Bird a Notice of Charges for refusal "to cell as assigned." (ECF No. 13 at 14.) Plaintiff also alleges various administrators, including Defendant Willie Clayton, Alexis Lozano, Thomas, Defendant Jonathan Binder, Defendant Julie Williams, Defendant Monique Hubbard-Pickett, Defendant Harold Wickham, Defendant Brian E. Williams, Sr., and Defendant James Dzurenda "all failed to take any action to correct the misconduct once they each became aware of them via the grievance process." (*Id.* at 11.)

Plaintiff filed a grievance against Officers Paryga and Atherton. In his informal grievance, Plaintiff alleged that Officers Paryga and Atherton "conducted a cell shake down on cell 11B19 in retaliation for [him] requesting a bed move due to safety concerns [he] was having. The two of them took books, legal papers, magazines, food and mail items." (*Id.* at 63.) The caseworker denied the grievance. (*Id.*) Plaintiff then filed a first level grievance in which he specified that Officers Paryga and Atherton took his property and were "discriminating against [him] as a Muslim." (*Id.* at 55-56.) The caseworker similarly denied this grievance. (*Id.* at 54.) Plaintiff then filed a second level grievance where he specified the officers took his "books, legal papers, magazines, mail and religious diet for the day." (*Id.* at 50.) The caseworker denied this final grievance, specifying that Plaintiff "failed to provide sufficient documentation, and or receipts to prove ownership of the

1  property in question." (*Id.* at 49.)

2  Plaintiff then brought claims in this Court for 1) retaliation for the exercise of
3  his First Amendment rights; 2) violation of the Religious Land Use and
4  Institutionalized Persons Act (RLUIPA); 3) violation of Due Process Clause under
5  the Fourteenth Amendment; 4) violation of the Free Exercise Clause of the First
6  Amendment; and 5) violation of the protections against cruel and unusual
7  punishment and excessive force under the Eighth Amendment. (ECF No. 13.) In
8  screening the SAC, this Court dismissed the Eighth Amendment and Fourteenth
9  Amendment claims. (ECF No. 14 at 12.)

10  **II.    LEGAL STANDARD**

11  "The purpose of summary judgment is to avoid unnecessary trials when there
12  is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't*
13  *of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate
14  when the pleadings, the discovery and disclosure materials on file, and any
15  affidavits "show there is no genuine issue as to any material fact and that the
16  movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477
17  U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary
18  basis on which a reasonable fact-finder could find for the nonmoving party and
19  a dispute is "material" if it could affect the outcome of the suit under the
20  governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The
21  court must view the facts in the light most favorable to the non-moving party and
22  give it the benefit of all reasonable inferences to be drawn from those facts.
23  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

24  The party seeking summary judgment bears the initial burden of informing
25  the court of the basis for its motion and identifying those portions of the record
26  that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477
27  U.S. at 323. Once the moving party satisfies Rule 56's requirements, the burden
28  shifts to the non-moving party to "set forth specific facts showing that there is a

genuine issue for trial." *Anderson,* 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists[.]" *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

### III.  DISCUSSION

#### a. Administrative Exhaustion

Defendants allege that Plaintiff's "claims are barred for failing to exhaust administrative remedies" except for his claims of retaliation against Officers Paryga and Atherton. (ECF No. 49 at 14-15.) The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e (a). Under the PLRA, "a prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process." *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)). "[P]roper exhaustion of administrative remedies…means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id.* at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original).

Requiring administrative exhaustion serves two main purposes: 1) protecting "administrative agency authority" by allowing the agency to correct its mistakes before the issue is brought into federal court and "[discouraging] 'disregard of [the agency's] procedures'"; and 2) promoting efficiency. *Woodford,* 548 U.S. at 89 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992), *superseded by statute*, The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e, *as recognized in Woodford*, 548 U.S. at 84-85). Because the grievance process is intended to help the agency internally resolve issues, "a grievance suffices if it alerts the prison to

the nature of the wrong for which redress is sought." *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (quoting and adopting standard from *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). "To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations." *Sapp v. Kimbrell*, 623 F.3d 813, 924 (9th Cir. 2010) (citing *Jones v. Bock*, 549 U.S. 199 (2007)).

NDOC has established a three-step grievance process. Prisoners must submit an informal grievance, a first-level grievance, and a second-level grievance to exhaust their claims. *See* NDOC Administrative Regulation (AR) 740 (2022). The regulations instruct prisoners to file an Informal Grievance (DOC 3091) "after failing to resolve the matter by other means, such as discussion with staff or submitting an Offender Request Form (DOC 3012)." *Id.* AR 740.08 (1). "All documentation and factual allegations available to the offender must be submitted at [the informal grievance' level with the grievance." *Id.* AR 740.08 (5).

Plaintiff did not exhaust his claims against the supervisory defendants, including Defendants Lt. Binder, Sgt. Clayton, Former Director Dzurenda, AW Hubbard-Pickett, AW Williams, Former Deputy Director Wickham, and Deputy Director Williams. In his Complaint, Plaintiff alleged that these Defendants failed to intervene to stop the constitutional violations connected to the cell search and taking of his property. (ECF No. 13 at 13.) However, Bird never submitted any grievance about these Defendants' conduct, so these claims are currently barred by the PLRA. Plaintiff stated in his First Level Grievance that "[n]o attempt by staff was made to report or correct Officer Paryga or Atherton for their misconduct as AR 339.01(7) states shall be done as well as AR 339.04(1), (B)." (*Id.* at 61.) However, this claim was not brought up in his informal grievance and fails to identify the specific staff involved, so the claims were not exhausted.

Plaintiff also failed to exhaust his religious claims. Plaintiff alleged that Defendants violated RLUIPA and the Free Exercise Clause of the First

1  Amendment by taking his religious books, meal, and other religious materials.
2  (*Id.* at 10, 21.) However, while Plaintiff submitted the required grievances alleging
3  the taking of his property, he was not consistently clear about the religious nature
4  of the property in question to put the Defendants on notice of RLUIPA and Free
5  Exercise claims. At the Informal Grievance stage, Plaintiff alleged Officers Paryga
6  and Atherton "took books, legal papers, magazines, food, and mail." (*Id.* at 67.) In
7  his First Level Grievance, Plaintiff claimed the Officers took his property and
8  "were discriminating against [him] as a Muslim," but did not provide any more
9  information about this latter claim. (*Id.* at 55-56.) In his Second Level Grievance,
10 Plaintiff stated he was complaining about "theft of [his] books, legal papers,
11 magazines, mail, and religious diet for the day." (*Id.* at 50.) He also attached an
12 envelope addressed to Quran Account Inc. and an invoice from Liberation Prison
13 Project for a book on Buddhism. (*Id.* at 57, 58.) This was the first time Plaintiff
14 specifically brought up religious meals and books. Plaintiff did not mention the
15 taking of a Quran or prayer mat/towel until his Complaint. (*Id.* at 17, 18.) Thus,
16 the grievances failed to "[alert] the prison to the nature of the wrong for which
17 redress is sought." *Griffin*, 557 F.3d at 1120 (quoting and adopting standard from
18 *Strong*, 297 F.3d at 650). Because these claims were not exhausted, the only
19 remaining claim is Plaintiff's First Amendment retaliation claim against Officers
20 Paryga and Atherton.[1]

21 **b. First Amendment Retaliation Claim**

22 The Court now turns to Plaintiff's First Amendment retaliation claim. To state
23 a viable First Amendment retaliation claim, the prisoner must allege five basic
24 elements: "'(1) [a]n assertion that a state actor took some adverse action against
25 an inmate (2) because of (3) that prisoner's protected conduct, and that such
26 action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the

---

[1] Defendants do not dispute that Plaintiff exhausted the retaliation claim. (ECF No. 49 at 15.)

6

action did not reasonably advance a legitimate correctional goal." *Chavez v. Robinson*, 12 F.4th 978, 1001 (9th Cir. 2021) (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005)).

### i. Adverse Action

Plaintiff properly alleged that Officers Paryga and Atheron took an adverse action against him. "[A] retaliation claim may assert an injury no more tangible than a chilling effect on First Amendment rights." *Broadheim v. Cry*, 584 F.3d 1262, 1269-70 (9th Cir. 2009) (quoting *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001)). "[T]he mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect." *Id.* at 1270 (emphasis in original).

In the present case, Plaintiff alleged even greater harms than a threat, and thus met the adverse action criteria. Here, Plaintiff claimed that Officers Paryga and Atherton "attempted to harass [him]/shame [him] into abandoning his reporting of the [cellmate] issue." (ECF No. 13 at 9.) Officer Paryga told Plaintiff "[f]ight him or fight me" after Plaintiff requested the cell change. (*Id.*) The officers "thrash[ed] the cell in retaliation" for voicing his concerns that he and his cellmate may end up fighting. (*Id.*) They then took Plaintiff's "personal property such as religious books, legal papers, personal mail, food, etc." without issuing "any unauthorized property forms to [him] so that he could appeal their action/misconduct." (*Id.*) Plaintiff's allegations that the officers made threats, conducted an arbitrary cell search, and deprived him of his property, meet the adverse action requirement. *See Rhodes*, 408 F.3d at 568 (finding that an inmate alleged an adverse action sufficient for a First Amendment retaliation claim when he claimed officers arbitrarily confiscated and destroyed his property, threatened to transfer him, and assaulted him).

Defendants argued that no adverse action occurred. Defendants denied any property was even taken, and, even if they took any property, the property was

7

contraband because it was not listed on his property card. (ECF No. 49 at 7.) Plaintiff responded that he received the Quran from a prison chaplain and that religious books are never listed on prisoner property cards. (ECF No. 51 at 3.) In addition, he received a prayer towel from the prison laundry department. (*Id.*) Plaintiff also claimed the property cards "are often not accurate as they are rarely updated on a regular basis when prisoners are transferred, or lose items or have items taken." (*Id.* at 4.) At a minimum, Plaintiff's allegations raise a genuine dispute of material fact regarding whether an adverse action occurred.

### ii. Causation

Plaintiff also properly alleged the adverse action took place because of his protected conduct. "[A] plaintiff must show that his protected conduct was 'the substantial or motivating factor behind the defendant's conduct.'" *Brodheim*, 584 F.3d at 1271 (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)). At the summary judgment stage, the Plaintiff "needs only 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [Defendants'] intent…'" *Id.* (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)).

In his Complaint, Plaintiff alleged that Officers Paryga and Atherton took his property because he had tried to request a bed move due to safety concerns with his cellmate. (ECF No. 13 at 12.) According to Plaintiff, he "had already packed (rolled up) all of his property for his pending cell move," so there was "no justifiable reason" for the cell search or removal of his property. (*Id.* at 11.) Defendants argued that "Bird did not engage in any protected conduct, much less that Bird was deprived of property because of protected conduct." (ECF No. 49 at 7.) According to Defendants, "[r]eporting that a fight may result with his cellmate is not an 'activity safeguarded by the Constitution' because Bird did not actually report any facts which would have led officers to believe that a fight was likely to result or that his cellmate was likely to start a fight." (*Id.* at 7-8.) However, taking

facts in the light most favorable to Bird, Plaintiff sufficiently alleged a fight was likely to occur. Plaintiff requested a cell change "at once due to issues with his current cellmate that if left unaddressed would lead to a fight" and Defendants never presented evidence at the summary judgment stage to contradict this claim. (ECF Nos. 13 at 9; 49 at 7-8.)

Beyond the lack of evidence to contradict Plaintiff's claim about the potential of a fight occurring, Defendants rely on inapplicable case law. They first cited *Blaisdell v. Frappiea*, 729 F.3d 1237, 1247 (9th Cir. 2013) for the idea that serving process on another inmate's behalf is not a protected activity. (ECF No. 49 at 8.) However, Plaintiff was trying to raise a safety concern, not help another inmate serve process or do anything similar. Defendants then cited other cases involving inmates making "verbal challenges or rantings" or expressing general frustrations, which are distinguishable from the given case where Plaintiff tried to bring safety concerns to the prison's attention. (*Id.*) Plaintiff properly alleged that the officers acted in response to his constitutionally protected right to make an informal verbal grievance, and Defendants provided no persuasive factual or legal support for the idea Plaintiff's speech was not protected nor that they acted for a non-retaliatory purpose.

### iii. Chilling Effect

Plaintiff's allegations fulfill the chilling effect criteria. Plaintiffs need only meet "an objective standard." *Brodheim*, 584 F.3d at 1271. "[A] plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill *or* silence a person of ordinary firmness from future First Amendment activities.'" *Id.* (quoting *Mendocino Enviro. Center v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)) (emphasis in original).

Here, Plaintiff claimed that Defendants' conduct chilled his speech. In his Complaint, Plaintiff explicitly stated that Defendants' conduct chilled his speech.

1  (ECF No. 13 at 12.) While Defendants claimed "Bird's speech was certainly not
2  chilled as he submitted a grievance," this contradicts Ninth Circuit precedent.
3  Indeed, the Ninth Circuit has spoken out against "'allow[ing] a defendant to
4  escape liability for a First Amendment violation merely because an unusually
5  determined plaintiff persists in his protected activity.'" *Brodheim*, 584 F.3d at
6  1271 (quoting *Mendocino Enviro. Center*, 192 F.3d at 569). In addition, an
7  ordinary person might similarly be dissuaded from making future complaints
8  when told "[f]ight him or fight me" by a correctional officer after bringing a safety
9  issue to their attention. (ECF No. 13 at 9.)[2] Such an individual would also likely
10 be dissuaded from making any complaints for fear that their property would be
11 taken, even if the prison claimed that the officers never took anything, or at most
12 seized contraband. Thus, the Court finds that Plaintiff sufficiently alleged that
13 the officers chilled his speech.

### iv.  Legitimate Penological Interest

15  Lastly, "[t]o prevail on a retaliation claim, a prisoner must show that the
16 challenged action 'did not reasonably advance a legitimate correctional goal.'"
17 *Brodheim*, 584 F.3d at 1271 (quoting *Rhodes*, 408 F.3d at 568). The U.S. Supreme
18 Court has held that courts may only consider the *Turner* factors[3] "in determining
19 whether a proffered legitimate penological interest is reasonably related to a
20 regulation which infringes on a prisoner's constitutional right." *Id.* at 1272 (citing
21 *Shaw v. Murphy*, 532 U.S. 223, 228 (2001)). These factors include 1) "'a valid,
22 rational connection between the regulation and the legitimate [and neutral]
23 governmental interest put forward to justify it'"; 2) "the existence of 'alternative
24 means of exercising the right' available to inmates;" 3) "'the impact
25 accommodation of the asserted constitutional right will have on guards and other

---

[2] The prison claimed this statement was not intended as a threat but was instead an attempt by Officer Paryga to determine if Plaintiff was threatening his cellmate or vice versa. (ECF No. 13 at 49.)

[3] These factors were set forth in *Turner v. Safley*, 482 U.S. 78 (1987).

inmates, and on the allocation of prison resources generally" and 4) "'the absence of ready alternatives' available to the prison for achieving the governmental objectives." *Id.* (quoting *Shaw*, 532 U.S. at 228).

The Court finds that the search and seizure was insufficiently related to legitimate penological interests. Defendants claimed that "NDOC has a legitimate correctional goal to require inmates to list their property on property cards in order to prevent inmates from stealing property from other inmates and claiming it as their own." (ECF No. 49 at 9.) Without addressing the merits of this goal, preventing inmate theft does not appear relevant to the given case. Defendants never proffered any reasons why they believed there was a risk of contraband or theft to justify the search and seizure of property. In addition, Plaintiff claimed the property cards were infrequently updated and often inaccurate, which, if true, undercuts the prison's stated interest. (ECF No. 51 at 4.) Furthermore, NDOC's own regulations call for prisoners to file Informal Grievances "after failing to resolve the matter by other means, such as discussion with staff or submitting an Offender Request Form (DOC 3012)." AR 740.08 (1) (2022). Thus, the prison even encourages prisoners to talk to staff before relying on the grievance process, leaving the prisoner with few alternatives to informally resolve prison issues. Allowing prisoners to discuss issues with prison staff before turning to the grievance process would likely save the prison resources by allowing for informal resolutions. *See Entler v. Gregoire*, 872 F.3d 1031, 1040 (9th Cir. 2017) (finding the prisoner properly sought informal resolution of his concerns prior to filing a grievance as called for in the DOC Grievance Program Manual and that this informal resolution reduced the prison's administrative burdens and costs). As a result, the Court finds the *Turner* factors weigh in favor of Plaintiff. Based on the above analysis, the Court denies Defendant's Motion for Summary Judgment on the remaining First Amendment retaliation claim.

**c. Qualified Immunity**

The Court now considers Defendants' argument that they are entitled to qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable officer would [have understood] that what he is doing violates that right.'" *Id.* at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987)).

"'[T]he prohibition against retaliatory punishment is clearly established law in the Ninth Circuit, for qualified immunity purposes.'" *Rhodes*, 408 F.3d at 569 (quoting *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995)). Prisoners have the right to file grievances, and "the form of the complaints-even if verbal…-is of no constitutional significance." *Entler*, 872 F.3d at 1039 (citing *Hargis v. Foster*, 312 F.3d 404, 411 (9th Cir. 2002)). In *Entler*, the Ninth Circuit explicitly critiqued a district court for dismissing a case because the prisoner's informal complaints were not part of the grievance process and ultimately reversed the district court's dismissal of his First Amendment retaliation claims regarding his threat to sue. *Id.* at 1040, 1045.

Defendants are not entitled to qualified immunity. First, as discussed earlier, Plaintiff stated a viable First Amendment retaliation claim. Furthermore, the right against retaliation is clearly established under Ninth Circuit precedent. *Rhodes*, 408 F.3d at 569 (quoting *Pratt*, 65 F.3d at 806). The Ninth Circuit has been clear that "there must be avenues for prisoners to redress the wrongs or inadequacies of their state jailors." *Bruce*, 351 F.3d at 1290. It does not matter if the complaint was verbal or written for this analysis. *See Entler*, 872 F.3d at 1039 (citing *Hargis*, 312 F.3d at 411). Plaintiff's allegation that Officers Paryga and Atherton searched

his cell and removed items, including those of a religious nature, in retaliation for requesting a cell change because of security concerns clearly falls within Ninth Circuit established law. Thus, the Court denies qualified immunity for Officers Paryga and Atherton.

**IV.   CONCLUSION**

It is therefore ordered Defendants' Motion for Summary Judgment (ECF No. 49) is granted in part and denied in part.

It is further ordered that all claims against the supervisory defendants, including Defendants Lt. Binder, Sgt. Clayton, Former Director Dzurenda, AW Hubbard-Pickett, AW Williams, Former Deputy Director Wickham, and Deputy Director Williams are dismissed.

It is further ordered that the RLUIPA and First Amendment Free Exercise claims are dismissed against all defendants.

It is further ordered that Defendants' Motion for Summary Judgment is denied as to the First Amendment retaliation claims against Officers Paryga and Atherton.

DATED THIS 8th day of September 2023.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE